Good afternoon, counsel. Good afternoon, Your Honor. We are pulling in people from various places today. If you have any technical difficulties, please speak up or contact the clerk. We have, by audio, Judge Roth. Yes, I'm hearing you loud and clear. Wonderful. And by video and audio, Judge Fischer. I'm hearing and seeing everybody loud and clearly. We have a counsel present in the courtroom, and I believe, I hope, are also connected by audio. Yes, I am. Very good. Okay. Ms. Relick, you got it? Okay. Thank you. Thank you. Good afternoon, Your Honors, and may it please the Court. My name is Attorney Dana Relick. With me at counsel table is my partner, Brendan Levesque, and Attorney Paul Jimenez, the General Counsel of the Virgin Islands Superior Court. We represent the defendants, notably Marshall Rick Richardson and the Superior Court of the Virgin Islands. I am, however, today presenting oral arguments on behalf of all three defendants, including the government of the Virgin Islands. Do you wish to reserve any rebuttal time? Yes, please, Your Honor. Four minutes. Thank you. I'd like to begin with our arguments with regard to qualified immunity. This issue is dispositive of all issues that are pending against all defendants. I'd like to start by noting, as this Court knows, that we are here for the second time on the issue of qualified immunity, but we are here under entirely different circumstances. Counsel, just with the statement you started out with, that is the qualified immunity is dispositive on all issues. I understand that Defendant Richardson, in the underlying summary judgment papers, had moved for qualified immunity only as to count one. The other defendants had raised qualified immunity as to the other counts, but he did not. What is the significance of that? And also, to the extent that qualified immunity goes to the federal claims, how does that apply to the common law claims that we have? That is negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. I'd start with your second question, Your Honor. Qualified immunity protects officials in their individual capacity, not just in 1983 actions, but with regard to claims for civil damages in general. The U.S. Supreme Court has been fairly clear on that point. So it would protect Deputy Mark Richardson from the claims, not just with regard to 1983, but also the claims made with regard to negligence, negligent inflection of emotional distress, and the intentional inflection of emotional distress. Is NIBS what you rely on for that proposition? Your Honor, it's in my notes. I don't have it at my fingertips. If it's okay, I'd like to address that point on rebuttal. Thank you. I certainly will have that answer for you. With regard to the... Staying with that question as it relates to Officer Richardson, is Judge Frost correct that he only raised qualified immunity as to the 1983 claim? To be totally honest, Your Honor, my understanding is that he raised qualified immunity as to the counts against him for civil damages, which are not just limited to the 1983 claim. I'm pulling out the motion itself in our appendix. But my understanding is that, as we've been proceeding on this case, that he was moving for summary judgment on all counts against him for civil damages. And that would also pull in the government and the Superior Court when it comes to the claim against them for vicarious liability. Specifically in his memorandum, without getting into details, I understand that the memorandum itself was filed under seal. But if you could advise us, with regard to the statement on page 18, it does appear to be limited to count one. And again, if you want to come back to that in rebuttal, you're welcome to. Yes, I would like to, Your Honor. I'm sorry. I don't have it directly in front of me. I'll make a point of addressing that first in my rebuttal. Thank you. Any other questions to Judge Fischer on that point? Thank you. Judge Ross? No. Okay. The issue as we're moving forward with regard to qualified immunity is under entirely different circumstances here at the summary judgment stage, as opposed to the first time we visited this court at the motion to dismiss stage. At that time, we were constrained to the allegations that were made in the plaintiff's complaint. This time, we have a much more developed record that has been developed as limited discovery was put forth for summary judgment. That's correct, Your Honor. And do you agree that, as we're also on interlocutory appeal, we don't have jurisdiction to consider whether the district court identified the correct set of facts that the summary judgment record is sufficient to support? The only question that we have jurisdiction to review is whether that set of facts, as identified by the district court, is sufficient to establish a violation of a clearly established right. That's correct, Your Honor, with one caveat. The United States Supreme Court in Scott v. Harris has suggested, or has stated, that if the set of facts put forth by the district court is blatantly contradicted by the record on its face, then the reviewing court on appeal may review the record de novo to decide whether or not the alleged disputed facts are actually in dispute. Let's look at the facts as the district court described those most favorably to the plaintiff here. And that seems to suggest, at page 19 of the district judge's opinion, that the door opened, that Defendant Richardson was startled and knocked off balance, and then shot at Plaintiff Thompson, who fell through the doorway. That is in contrast to the prior rendition, which was the government's rendition, that he actually feared for his life. Is it the Defendant's position that if, in fact, he didn't even have time to perceive Thompson in the doorway and shot at him because he was startled, that that's a reasonable use of deadly force? Your Honor, that's not the question that – let me answer the question first. It's our position that, yes, even if he was startled, that would be a reasonable use of deadly force, given the facts and circumstances going into this. Surrounding the situation. Surrounding the facts identified by the trial court, the two renditions, by the district court on page 19. The rendition, the second part, which is what you began with, Judge Krause, that he was startled, knocked off balance, that comes from, as the district court quotes it, de Chabert's deposition. That's actually factually incorrect. De Chabert testified specifically in his deposition that he couldn't see in the doorway. And the only time he could see was after the shot by Deputy Richardson, when LT fell into Deputy Richardson. His testimony and deposition actually says that. So the factual basis in the record for that is where the district court is getting that from is contradicted by the plain terms of what the court actually cited. But there are other authorities that are cited there, including his immediate report, the nearly contemporaneous report to his supervisor, in which Officer Richardson reported that he shot because he was startled. He shot because he was startled, but the very next question in Officer Dowling's deposition was, did he tell you any other reasons surrounding that? And Officer Dowling said, I can't remember. I think the question that he's asked after that is, did he tell you that he saw a gun? Did he tell you that he saw a weapon? And he said he can't recall. And he wasn't able to confirm that even that was related to him as part of that report. Counsel, let me ask you a question and maybe bring this down to the level which we have to answer. What is the question of law that you think is before us that we have to determine based on whether Officer Richardson's conduct was reasonable or even assuming it may have been unreasonable, whether the conduct or the right that LT had was clearly established? What is the question of law? How would you frame it? The question of law, Your Honor, has to be specific rather than general. So if we're starting with that second prong, which is whether or not the right was clearly established, the clearly established right that we're looking for is under these circumstances, where there was an arrest, an outstanding arrest warrant for LT, where Deputy Richardson undisputed, it's undisputed that he believed that LT might be armed, where LT was evading arrest, rummaging through the house and not obeying instructions, and where the sequence of events was less than a millisecond. Would a reasonable officer in that position with that knowledge have known that at the moment that he would be excessive force? In other words, would that be unlawful? If this is set out on page 25 of your response brief? Yes. Okay. Let me clarify. I'm sorry, Judge Roth. What page did you suggest? I'm sorry. Page 25 of your brief. Of our brief. Okay. Yes. Counsel, that's assuming that the officer did not actually, the reasonable officer did not actually see the suspect and whether the suspect was, in fact, armed or not. It doesn't matter whether he saw that the suspect was armed or unarmed, Your Honor. We know that now, with the benefit of hindsight, that the suspect was unarmed at the time he was shot. But at the time, Deputy Richardson believed that the suspect might be armed. In fact, his uncontroverted testimony demonstrates that when the door was thrust open, he was assaulted with the door. I mean, it hit him and he wasn't expecting it. He believed that, in his words, L.T. got the drop on him, that the plaintiff was trying to kill him. Is it enough for an officer to use deadly force, not constituting excessive force, to believe that a suspect might be armed without verifying that the suspect is, or without even perceiving whether the suspect is or is not armed? I think the answer in this case is yes, when the sequence of events unfolded this quickly. Deputy Richardson had to work with what he had in the very – may I answer the question, Your Honor? I apologize. Yeah, especially with people in different locations, we'll allow some extra time to both sides. We'll give you five minutes and we'll do the same for the other side. Thank you. Given the sequence of events and how quickly they unfolded, Deputy Richardson was constrained by the knowledge that he had, the reasonable belief that he had from his supervising deputy at the time that L.T. might be armed, and the fact that – which came from the mother directly. Was the belief that L.T. was armed reasonably based on the mother's statement that there was one recent social media posting of a weapon? Was that enough to give the officer, Officer Richardson and the other officers, a reasonable belief that he may have been armed? Yes, Your Honor, in this case it was. That information for Deputy Richardson came from his supervising officer who was at the scene, and Officer Marshall – I'm using those terms, I apologize, interchangeably – Officer Parrish, who was at the scene, who had spoken directly with the mother. Officer Parrish is not on trial, and the question of whether his belief was reasonable is different than the question of whether Deputy Richardson's belief, based on credible information coming from his supervising Marshall, in a very precarious and time-sensitive situation, was reasonable. And it certainly was, in these circumstances, a reasonable belief. Let me ask you, Counselor. Is there any evidence whether or not the safety was on or off on Deputy Richardson's gun? There's not evidence in the record of that, Your Honor. One would assume that it probably – the safety was off. That would be my assumption, based on how quickly the events unfolded. We know from Deputy Richardson's testimony, Your Honor, that his finger was on the trigger, he was holding the gun in his right hand as he unlocked the door with his left hand and was signaling to Marshall de Chavert as he unlocked the first lock and was preparing to unlock the door – conclude unlocking the door and open it with the doorknob. So that would be my assumption, Your Honor, but that's not in the record. Okay. What do we do – is there any significance to Officer Richardson's own testimony that he didn't know what Thompson's intentions were? All he knew, as he states on page 25 of his direct examination, is that he was hit by the door and then shots were fired. It appears from the follow-up – the questions that followed that he wasn't even necessarily aware it was his gun that fired the shot. He did describe it in the third person as if it was a surreal experience to him, Your Honor. I agree with that. So is there significance to the fact that he himself doesn't seem to have had a belief that there was an immediate threat of serious harm? Well, Your Honor, I would disagree with the underlying premise. That might be significant, but that's not what Deputy Richardson testified to. He did testify directly that he was in fear for his life and that he was in fear for Deputy de Chabert's life. It doesn't particularly matter whether he knew the plaintiff's intentions or not, because the question – the pivotal question is not whether it was reasonable from the victim's point of view and from what the victim knew. The question is would it have been reasonable from an objective, reasonable officer's perspective in Deputy Richardson's shoes? So what did Deputy Richardson know? And at the time, we know from the undisputed facts in the record that he knew and believed that the plaintiff might be armed, that the plaintiff had been evading arrest, that the plaintiff was not following directions, that the plaintiff's mother was afraid not only for her own safety but for the safety of her other son who lived in the home with her, and that everything – he was surprised with the door when it assaulted him and hit him, and because he was in fear for his life and startled, both of those things, he discharged the weapon. Well, those are two different versions of what happened from different parts of the testimony and, in fact, different locations. An affidavit, for example, versus a deposition, versus his contemporaneous report to a supervisor. And those are credibility determinations that could be left to a jury if the case were to move forward. Given some of the statements that do suggest that he shot only because he was startled and that he didn't have observations at the time that led him to believe the intentions of Thompson were to harm him, why isn't that a disputed issue of material fact that should move forward to a jury? Your Honor, I don't believe that the record demonstrates that specific second version of the facts. The record does demonstrate that Richardson was startled and that he was in fear of his life. The record does demonstrate that while he said, I believed he had the drop on me and he believed that he was trying to escape, he didn't know what else he was actually trying to do, but that doesn't matter. So even if those – I guess the ultimate point here is that even if those are disputes of fact, they're not disputes of material fact, because either way, on either set of records, the way that Richardson reacted and his action in that moment was reasonable. Are these sets of facts inconsistent, necessarily? I'm sorry, Your Honor, can you repeat the question? The series – the different versions of facts that Judge Krauss recited, are they necessarily inconsistent? Not necessarily, Your Honor, especially the version – well, the two – I think everyone can agree, even plaintiff and plaintiff's brief can agree, that the first of the three points that the district court recognized as disputed, whether he was armed or might be armed, the plaintiff conceded in their brief that there was a belief that he might be armed, and our position is that's enough. On the second point, with regard to what Richardson saw, whether he was charging through the doorway, or whether, as the district court describes him, as having fallen through the doorway, we know from the record, first, that Deputy Deshabert actually testified that he didn't see the suspect, or he didn't see LT until after the shot had been fired. So he didn't see whether he was charging through the doorway. He just saw him after the shot had been fired, and he fell. So the record, however, does show that Deputy Richardson said, he was charging at me, I was in his way, it looked like I was in his way, and he was running, which is consistent with the allegations made by the plaintiffs themselves in their amended complaint that LT was attempting to run past the marshal. Well, he says that in one place, but in his deposition testimony, he says he shot, the door opened, and then the shot went off, and that it was, it sounded simultaneously. Deputy Richardson, you mean, not Deputy Deshabert? Deputy Richardson's direct testimony. Let me ask the question that Judge Roth asked you a slightly different way, and that is, could a reasonable jury find that those two versions of events are inconsistent, and make a credibility finding as to one of them? No, Your Honor. I think a reasonable jury could only find that based on either version of events, that Deputy Richardson acted reasonably in the circumstances. One more question on this issue, and again, I'm keeping an eye on this. I know, I'm way over it. And we will make sure that the other side has equal credit. I'd like to ask one more question. Yeah. I defer to Judge Roth. I'd like to ask one question on sovereign immunity after we're done with this question. Okay. Quick question on qualified immunity. Is it the government's position that we should decide this on the fact that there is no claim to fail to make out a violation of a constitutional right, or the second prong, that the right at issue was not clearly established at the time? Which is your position of the prong we should choose in deciding this? Well, Your Honor, we believe we win on both prongs. But if you're starting with either prong, what the U.S. Supreme Court has frequently done, they've assumed arguendo that a constitutional right was violated and moved directly to the second prong, which is whether or not that right was clearly established. As I began with, we're not conceding by any means that there was a constitutional right violated. We firmly believe there was not a constitutional right violated. But if the court were to choose one to begin with, it could begin with the second prong. Thank you. On the second prong, given the cases that we asked you to be prepared to address, that is, cases where there actually was a weapon, but it was found to be an unreasonable use of deadly force, where the weapon, although in hand, for example, a knife, was not actually being brandished or used in a threatening manner, if that doesn't constitute an obvious immediate threat of serious harm, how could it be that a juvenile who might be armed, where it's not even confirmed that he is armed, poses such a threat? Well, the circumstances of all three cases that the court pointed us to, Your Honor, are very different. The first case, the AKH case, I'll just refer to each case by the plaintiff's name, or the first name of the case caption. AKH, the victim was known in that case, known by the officers that were apprehending him, that he was not armed. They nevertheless, and the court noted there was no threat of danger. He was walking down the road with one hand in his pocket, the other hand hanging out. There was not a dangerous crime that was being committed or had been committed. So there was no known serious threat of danger at all to the officers or the public. That is in stark contrast to this case, where there was an immediate threat to Deputy Richardson and Deputy de Chabert. With regard to the second case, the Tenorio case, where the gentleman was wielding a knife and had been described as drunk in his living room, the court noted in that case that, again, there was no threat of harm because he was walking. Although he had not abided by a direction to drop the gun, there was no immediate serious threat to anyone in the vicinity, and the court noted that. I will note that with the Tenorio case, it's actually in stark contrast to the 2018 Casella case by the U.S. Supreme Court, where in a per curiam decision, the court addressed a situation, a very similar situation, where an individual was wielding a knife and did not pose any threat to the officers that were surrounding him, and the officer who shot that individual through a fence was found to be protected by qualified immunity because the officer perceived a threat to another individual nearby, even though that individual had testified that she felt no threat whatsoever from the individual wielding the knife. The Supreme Court said that doesn't matter. What matters is the perception of the officer, him or herself, in that situation, and the officer in that situation perceived a serious threat of harm to another individual and was justified in shooting. And then finally, in the Seventh Circuit case, the Weinman case, that was with a gentleman in the garage holding a shotgun, and it was laying across his lap. It wasn't being pointed at anyone, and he was allegedly suicidal, and the court said in that case that there was no threat to the officer. There was no threat to anyone in that scenario, perhaps with the exception of the gentleman holding the gun, but it was laying in his lap and wasn't being used for any purpose. And again, these three cases, including this one I just discussed, are in stark contrast to the case where we have here, we have a reasonable belief by Deputy Richardson that the officers, at least he and Deshabert, there was an immediate threat of harm to them, of serious physical harm to them. And so he acted accordingly. So all three of those cases are easily distinguishable because there was no threat of physical harm to any of the officers. What has the Supreme Court said is needed to have clearly established law? The Supreme Court has said that when you have a clearly established law, you don't need a direct case on point. But what you do need is some kind of case law, typically from the same circuit or the U.S. Supreme Court, at the time of the conduct, that gives the officer an idea, adequate notice, that what they're doing is in violation of the law. So in this case, when the question is the exercise of allegedly excessive force, would Deputy Richardson have known at the time he pulled the trigger that it was illegal or against the law for him to shoot LT as he was being assaulted in the doorway? That's the question. I have, if we could, I have just one perhaps general question on the issue of sovereign immunity, which you continue to raise. And, you know, in this case, in this case, you know, you can't deny that the government of the Virgin Islands received prompt notice of intent within the 90 days, and that Ms. Russell later filed a claim with the court in the form of complaint. So why shouldn't we find that the appellees have substantially complied with the VITCA's requirements, particularly considering the purpose of the statute, the principal purpose of the statute, that being notice? Sure. The purpose of the statute, Your Honor, is notice, but it also provides sovereign immunity, and therefore it needs to be strictly construed. So when we're strictly construing the express terms of the statute, we know that if a litigant chooses to file both a notice and a claim, that they have to do so according to very express, strict terms in the statute. No, we agree. But hasn't the Virgin Islands Supreme Court, who we need to determine, we need to predict how the Virgin Islands Supreme Court would determine this question. Hasn't the Virgin Islands Supreme Court said that substantial compliance is sufficient? Your Honor, the Virgin Islands Supreme Court has said that substantial compliance is sufficient only insofar as it was discussing the adequacy of notice of the substance of the pleading. So this is in Brunn v. Dowdy where the Supreme Court said, what's at issue before us is whether or not the allegations made in the pleadings were sufficient to put the parties on notice of what the claim would be. And because they have substantially complied with the notice, those notice requirements of what the statute says you need to plead in a claim, we're going to allow it to proceed. Brunn v. Dowdy doesn't say anything about substantial compliance with timelines or due dates. And our whole point is that it's impossible to substantially comply with a deadline. You either do comply with it or you don't comply with it. And in this case, it's undisputed that the plaintiff never filed their complaint with the governor. They served it upon the Attorney General, but they never filed their complaint with the governor ever. Not even within the two years, but ever. And so what we have here is strict noncompliance with the statute. Because the statute needs to be strictly construed because it's sovereign immunity, the plaintiff didn't comply with those terms, and therefore sovereign immunity was not waived. Why don't we take the language of the statute at face value, and that is 3410 says that the claim or notice of intention shall be filed in the office of governor and a copy served on the Attorney General. You're asking us to read it to say and instead of or. Well, Your Honor, I am. And the reason is because the statute needs to be construed as a whole in its entirety. So if you look, if we back up just one step and we look at what sections 3409 and 3410 require, 3409 is the section of the statute that states what must be filed. So it says, listen, you can file just a claim, and if you do so, you have to file it within the 90 days, and you have to do it this certain way, right? Or it says you can file a notice of intent to file a claim and a claim. If you choose to do that, you have to file the notice within 90 days and the claim within two years after the accrual of the incident. 3410 is the only section in the statute that tells you where and how to file those things, right? So if we look at that, 3410 says if you filed a notice or you filed a claim, they have to be filed with the governor and then served upon the Attorney General. What that's saying is that either route you go to, whether you decide to file the notice or you decide to file the notice and the claim, they both have to be filed with the Attorney General or with the governor and served with the Attorney General. Why isn't that where substantial compliance comes in? I mean, in the Byrne case, the Virgin Islands Supreme Court was citing approvingly to Pickering v. Government of Virgin Islands, which was a case that looked at the notice as sufficient to be a claim because it had the same information. But in Pickering, the issue wasn't with deadlines and with construing this part of the statute. Again, there's a difference between talking about the sufficiency of what's being pled versus when it's pled and upon who it's served in accordance with the statute. So strictly construing as opposed to looking for, strictly construing the statute means looking at it in context. And this court has said before that you can construe the word or in the conjunctive instead of the disjunctive if the context of the statute requires it. The only reasonable reading of 3409 and 3410 together requires reading the or in that clause. Your Honor, in the conjunctive. And the reason is because if you were to read it in the disjunctive, it would effectively read 3409 out of the statute. Because if you only have to serve one of the two upon the Governor and the Attorney General, what's the point in filing the other to begin with? Now wasn't all this considered and decided by us in the first time we heard this case? And considering the cases you cite in the Abramson case, we decided that there was substantial compliance. What are you arguing differently here that we didn't decide already? Well, Your Honor, we're certainly re-arguing that substantial compliance is the wrong standard by which to construe the Virgin Islands Tort Claims Act. And because this statute implicates subject matter jurisdiction, there's nothing legally precluding us from raising the issue at a separate stage of the proceedings. So that's what we've done. And there's certainly nothing precluding this court from reconsidering its decision in light of the fact that we're at a separate stage of the proceedings and in light of the fact that our claim is that the legal standard of substantial compliance is erroneous. What is the significance? You pointed us to New York law and to the New York statute on which the Virgin Islands statutes were modeled as being what you've termed controlling. But the New York statute provides explicitly that there should be service upon the Attorney General within the time provided herein for filing with the clerk of court. And the Virgin Islands opted not to include that separate service requirement in its statute. Well, isn't that what leaves room for the substantial compliance position that the Virgin Islands Supreme Court seems to take and that was taken in Hickory? No, Your Honor. And the reason is, so I'll take your question in parts. With regard to the first part, the significance of the New York case law that we cited is, as you've noted, that the Virgin Islands Tort Claims Act was adopted, lifted essentially from New York, and the V.I. Supreme Court in Brun has said that when a statute is adopted from another jurisdiction, it would consider the case law from that jurisdiction in the years prior to that version of the statute to be binding precedent. So that's why we cited New York case law with regard to the interpretation of the statute. With regard to the second part, the addition of language with regard to when something needs to be filed and served upon the Attorney General doesn't change the language of the Virgin Islands Tort Claims Act where it specifically says that you have two years to file the complaint or the claim, and in 3410, filing it means filing it with the governor and then serving it upon the Attorney General. So construing the statute on the face of the statute is not affected at all by what New York did with their statute. If you look at the face of the Virgin Islands statute, the language itself requires that service upon or that filing the document itself with the governor must happen within the two years. So that's what makes that language in the New York case statute relevant. We'll hear back from you in rebuttal. I think we've gone an additional 15 minutes beyond the five we gave you. To the extent that I believe you would like it, we will ensure that you have an equal opportunity to address us. And we'll hear now from Ms. Ross Edwards. Yes, good afternoon. I represent the plaintiffs in this matter, the plaintiff appellees in this matter. If the court will allow, I will address the sovereign immunity issue first only because it is our position that there are no new arguments that are being raised here, and while their position is that this is a subject matter jurisdiction that they should be able to raise at any time, there should be new arguments. There should be something outside of what was argued before when this court decided this issue. As counsel aptly admitted, there are no new arguments. They just feel that they should be able to repeatedly raise subject matter jurisdiction if they're not satisfied with the ruling of the court just because jurisdiction is an issue that's never waived. We submit to the court that in this particular case, there are no new arguments. The court has fully addressed this issue. Counsel have the opportunity to argue this issue before and have flushed out all arguments similar to what are being made here today by counsel. For that reason, this issue should not again be addressed by the court. Counsel, isn't it a new argument that the claim itself wasn't verified? They've raised generally that there was a lack of verification previously. We had answered that in our opinion looking at the verification, the notarization of the notice of intent, but they point out now that the complaint itself was not verified and the plain language of 3410 seems to require verification of both the claim and the notice. How do you address that? Well, I believe that the verification as to the notice requirement, and of course 3410 does use the word or, and you can't ignore that it is a claim or the notice of intention. That notice of intention is in fact a sworn notice of intention essentially satisfying the verification requirement. And even to the extent that the court says, well, there needs to be some separate verification, we submit to the court that the notice of intention meets the substantial requirement, the substantial compliance requirement. But what about Section 3409C, which specifically says that if you file a notice of intention, you shall fill a claim within two years with the governor and the attorney general, and there's no dispute here that the governor never got a copy. Well, we believe that the notice of intention is in fact essentially a claim that's been filed, that's been given notice of the claim or claims that are being made by the plaintiffs in this case, and so we believe that we have met the requirements of 3409 when we serve the governor as well as the attorney general. Even though you never filed the copy of the complaint, which is slash the claim with the governor? That is correct. Again, I guess we're quibbling over the word claim, but the notice of intention is in fact a claim, and it specifically outlines all of the claims that the plaintiffs would be filing against the government, and it is a sworn statement. It is verifying. Okay, thank you. With regard to the qualified immunity issue, we believe that there is a clearly established right that was known to Richardson at the time of this incident. Now, the law is clear. We don't have to have case law exactly on point. Case law that is instructive is just as good, and Richardson had at his disposal several case laws, not only under the Virgin Islands, but within the federal system relative to whether what was the clearly established right he had or the victim had at the time this incident occurred. Counsel, how would you define the right at issue? Thank you. One moment. One moment. By using deadly force under circumstances that did not support that deadly force should be used. Well, that sounds at a very general level, and perhaps with Garner and Graham, as the court has indicated, where it's an obvious case that the right against excessive use of excessive force can be defined at that level of generality. But is it really fair to call this an obvious case when the officer has information that a suspect might be armed, where the suspect is heard to be rummaging around, presumably looking for something, and where the officer is then pushed over as the suspect is making a sudden exit? Is that really an obvious case where there is no serious threat of immediate harm to the officer? The circumstances of this case, as just stated, ignore some other relevant facts. One, that they were advised that this minor, 15-year-old, was in the house, essentially relaxing, that they were advised that he's a runner, not that he's violent, not that they need to be careful because he has weapons, but that he's a runner. He's going to try to escape through a broken window. That, in fact, two marshals appeared on the premises earlier. That would be Marshal Paris and Marshal Francis. And by the time Richardson had appeared, they had already been there for seven to ten minutes, because we heard that after several minutes, Paris called Richardson to ask him where he was, why he and a shepherd had not arrived as yet. And during that time, the minor was observed trying to leave out of a window, not with a weapon, and he was told not to do that. He went back in. All we heard was, the testimony is, there's a minor running up and down inside of the house. There were no threats from this minor or other aggressive language. Counselor, how can... Sorry? Counselor, I'm sorry. It's hard to... There's a slight delay from our end, and you're on the exact time, so I apologize for that delay and perhaps stepping on your answer. But let me just say, how can you ignore the facts that Officer Richardson had that the minor, the juvenile, may have had a weapon, okay, and that when he approached the door, he heard noise inside of a person who was running, and then all of a sudden there was a burst through that door? How can you ignore those facts, all of which Officer Richardson had before his gun discharge? We're not ignoring the facts. The key word is might, not that he had a weapon, not that there was information that he did in fact have a weapon. What difference does that make necessarily to the objective determination as to whether or not Officer Richardson's state of mind was reasonable? Well, the fact is that there was no other corroborating information available to Richardson that in fact he might have a weapon other than a Facebook page that occurred weeks before, and he was aware of that. He was aware of that, and he had that discussion with Marshal Paris, who conveyed that to him, and he had that discussion when he communicated with Marshal Sabur. The question is the reasonableness. I'm sorry. Counsel, where in the record does it indicate that Richardson was specifically told that this was a posting from weeks earlier, or a single posting from weeks earlier? I don't believe that there's a specific statement other than that. I would ask that the court give me some time, maybe in rebuttal, to be able to identify the part in the transcript. I don't think you're going to, as responding, you don't have rebuttal time per se. Except I did, well, maybe I misunderstood what the court said earlier when it said we'll give you five minutes, and then we'll give the other side five minutes. So I may have misunderstood. We'll give you additional time to address these points, but we will have a single rebuttal, and that will be from appellants. Okay. Well, I am not able to point out specifically the page or pages on which that is, but... You're welcome to send in a supplemental submission identifying that for us if it appears in the record. From my review of the record, I'm not aware of that particular information being conveyed, but perhaps you can point us to it. You also had stated a few minutes ago that Thompson was observed trying to leave the house through the window and was observed not to have a weapon. Where is that information in the record, that he was actually... Well, it doesn't... The testimony that was given does not speak specifically to a weapon. It speaks to him leaving, the LT trying to leave out of a window, but there is no testimony that he had a weapon. That would be an obvious... And so while there's not a specific statement to it, it's the fact that there's testimony that he was leaving from a window, but none that they observed a weapon. There's absolutely no testimony that he was observed with a weapon at any time during this entire encounter. There's also no testimony that he was observed without a weapon, right? That is correct. That is correct. In your brief, while we're talking about what's in the record, you also assert that he was nearly naked at the time he was shot. Where is that in the record? I realize that's in the complaint, but where is that in the summary judgment record? I believe it's just based on the allegation in the complaint. Okay. Counsel, Graham tells us that in evaluating the reasonableness of the use of force, we look to at least three factors, the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. Let's put aside the severity of the crime with this juvenile pickup order, but with the officer being knocked over and not knowing whether or not a suspect who he was told might be armed was, in fact, armed and was then immediately in front of him, and where that suspect had been attempting to evade arrest and was resisting the instructions to come out, why isn't it enough to have two of the three Graham factors satisfied? I believe that all three requirements have to be looked at. You can't just decide to just focus on one or two, although the weight given may be different. We keep speaking about Richardson being knocked over, and I think those terms do not accurately describe what happened, and that, in fact, the record has this disputing evidence in the record as to exactly what happened. That is a clear issue of fact, not only a finding by the lower court, but, in fact, the affidavits as well as the deposition testimonies as it relates to exactly what happened raises issues of fact. They're conflicting testimonies, and so the safety of the officer issue, insofar as it relates to Richardson being knocked over, for example, is questionable. With regard, yes, the door did suddenly open. Yes, Richardson was surprised by the opening of the door because he did not expect LT, who he knew was a runner, to try to flee. He didn't expect that to happen. Does that warrant the shooting? No, it doesn't. Mights have a weapon. We look at the cases that you asked counsel to focus on, and while opposing counsel attempted to distinguish them away, it's important to note that in two of those cases there were weapons, and under those circumstances the courts said, even though these weapons existed, that's not enough. That's not enough to qualify immunity to be granted, and in the case where the gentleman was walking in the road in Landros and he had his hand in his pocket and he took it out in an arcing motion, that alone isn't enough either. It's not one isolated fact. It is all the facts that you have to look at, and in this case the conflicting testimony includes a statement that Richardson, the door pushed open, Richardson saw him, he pulled back, and then he intentionally pulled his trigger. Excuse me, counsel. Counsel, where does it say he intentionally pulled his trigger? The word intention isn't there, but he says, and I fired. I don't have the exact language, Your Honor. The word intention is not in there. If he was startled and had his finger on the trigger, I mean I'm not saying startled when a kid says boo behind you, but startled by having a door slammed open in his face and his finger was on the trigger and his hand contracted from that impact, would you find the same liability in that scenario as if he was in fear of his life and pulled the trigger? My answer is yes. When you look at the circumstances, we are going to pick up a minor who is not there for a criminal offense or a felony, and you might have a weapon, and you approach with taking out your weapon, cocking or activating, I mean I don't know enough about guns, but cocking your gun and putting your hand on a trigger while you open the door, what are you expecting is going to happen? When he's startled, he's surprised, he steps back. His testimony implies as quickly as it happens a time to observe and then a firing, as quickly as it happens. I mean, Deputy Richardson said at first he didn't even realize he fired his gun. That is one version. That is one version. I mean there's an affidavit and there's affidavits to support that he admitted that he fired the gun. There is even testimony from Marsha Dowling where in speaking with Richardson, Richardson admitted that he shot him. And so, you know, what we're talking about is different versions,  Counsel, as to cases in our circuit, we've got the Carswell case. And one of the critical facts there was that the decedent was charging the officer. And there, of course, there was a greater distance so that the officer had an opportunity to give warnings and the suspect continued to charge. But here, simply because of the misfortune of the placement of the officer in relation to the door and where it opened so that it was opening into the officer and by his testimony appears to have startled him, why don't we have an analogous situation in a perception by a reasonable officer in that position that they were being charged and Carswell coming into play to say that that is not excessive force? What's interesting in Cardville and I think particularly relevant in this case is the opportunity that was given there to announce presence. Richardson approaches and attempts to open the door without even announcing. Shabert explains in detail how they entered and what occurred and admitted that no announcement was made in advance. There was no indication that this is law enforcement, this is the marshals, we are opening the door. And so his failure to announce also has to be taken into consideration in terms of his liability because they could hear that LT was moving about inside of the house and it was reasonable to expect LT because they knew he was a runner. When they opened the door, he may try to escape. They knew that. And so while it may be easy to distinguish Cardville, it's instructive in terms of the notice that law enforcement should have given and failed to give in this case. Was there any – is there any dispute here that Thompson was notified that there were officers outside and that they had previously requested that he come out and surrender and that he refused to do that? Instead he was – the consistent testimony, I believe, is that he was heard running and rummaging around the house. The testimony supports that, in fact, there were two marshals that were stationed to the side on the back of the house. No one ever indicated that we're about to try to enter the house. And why is that separate notice required? As law enforcement is about to enter the premises, knowing that a person is there, they should announce themselves. And indicate that we're coming in. Has that been pledged in this case? I don't recall seeing any pleading to that effect. There was the – there's not a separate pleading, but it is part of our excessive use of force claim. All of these things put together amounts to the excessive use of force. Counselor, it almost sounds like you're making an argument that LT had a right, under these circumstances, to run through the front door and not have anyone to run through the front door and run into an officer who was about to announce his presence. Isn't that, in effect, what you're arguing? No. No, that is not what I'm arguing, that he had a right to run through and into an officer. I am focusing on what the officers were aware of and what their responsibilities were when they were trying to pick up LT. Yeah, but don't we have to, in determining whether or not the officers are entitled to qualified immunity, ascertain what the right is that LT has? And that's why I said it sounds to me like you're making an argument that he had a right to run through that front door and run into an officer who was about to announce his presence. He had a right to be free from being shot as he was exiting his house. Okay. Counsel, we've recognized and the Supreme Court has recognized, for example, in Garner and Graham, the countervailing interests of officers in being able to execute search warrants and to take into custody suspects. What is unreasonable about an officer trying to unlock the door and to engage in the protective step in case the suspect coming out the door is armed and is intending to use those arms to have a gun that is with the safety off  Did you ask me what is unreasonable with him trying to take protective steps to access the house? Did I understand you correctly? Given the Supreme Court's recognition of the interest on the part of law enforcement in executing their duties, why is it unreasonable for the officer to be unlocking the door and also having been told that the person they're there to pick up might be armed to have a firearm that is cocked and ready? One, because the might be armed requirement, given all of the circumstances, it's insufficient in and of itself to support or to excuse him firing his gun and striking LT. But two, he is entering someone's home, an area that's generally protected by law,  LT was in the house, and an announcement should have been made that law enforcement is now entering the house in order not only to protect the officer, but to give the occupant notice that law enforcement was coming in. Counselor, if that's the right that you're identifying as violated, that is a right to be told that officers are entering the house, you need to persuade us that that right was clearly established. What cases are you relying on to say that that is a clearly established right that was violated? What I am arguing is that Thompson had a right to be free in his person from being shot by law enforcement as he was exiting his home. What I do, I cannot find any case specifically on point, but nonetheless instructive. If we look at this from the perspective of a reasonable police officer, is it your position that that officer's belief, having been informed that a suspect might have a firearm, and then being knocked off balance with that suspect immediately before them, that there's not a reasonable... the belief that that person poses an immediate danger is not a reasonable belief? I'm sorry, I think I missed... because I thought you didn't finish your question and then you did,  I understand your argument that it may not be reasonable to believe that he was armed. The information that the officer had was that he might be armed. But the question for us is whether there is an immediate threat to the safety of the officer or others.  And then the force of being knocked over by a door or anything else, and that suspect in immediate proximity to the officer. Why isn't the officer's belief at that point that the suspect poses an immediate threat of harm a reasonable belief? Again, I go back to the fact that when the officer arrived, he knew that there were fellow marshals there, that there was not any indication of a threat, no one advised that they saw a gun, that they knew there was a gun, only that there might be a gun, that there was a gun, and that when the marshals... as the marshals approached, they knew that he was a runner, so they knew to expect that he would try to run the minute they opened the door. Does the fact that they heard rummaging in the house, which indicates searching for something in the house, is that relevant to the reasonableness of an officer's belief that the suspect, that Thompson here, might have a firearm and posed a serious threat? I don't believe so in the absence of something more. We know he was running back and forth in the house. The rummaging... I don't believe that there's enough facts upon which to come to that conclusion, to say that it was reasonable. Do either of my colleagues have additional questions? No, I don't. Counsel, would you like to sum up, or is there any other points of argument you'd like to make? No, not at this point. Okay. Then we'll thank you, and we'll hear back for the four minutes of remaining rebuttal from appellants. Thank you, Your Honor. Counsel, let me ask you. Say the officers had been 20 feet from the door as Thompson burst through the door and came running. Is it the government's position that shooting immediately upon the door opening at that point would be reasonable? It's hard to say, Your Honor, in that circumstance. I might be inclined to say no. It's an entirely different circumstance than we have right here. In your hypothetical, Your Honor, there would be no assault by the door. He would have a better vantage point to see and perhaps more time to see if the threat of immediate physical serious harm would pan out. In this case, what we have is an immediate threat and an immediate situation with an assault on the officer by the plaintiff himself. No time whatsoever, other than time to react to what he perceived to be a threat, reasonably. Let me modify Judge Cross's question slightly. Let's suppose an LT had run through the door and run past both of the officers and was running away. Would they have the right to have fired the weapon at that point? Your Honor, based on Tennessee v. Garner, I think the answer has to be no. Tennessee v. Garner says that, actually the language is rather helpful, I think, to guidance in this case. It says, where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Judge Fisher, in your hypothetical, it's hard to find the threat of serious physical harm, especially while the plaintiff is running away and his back is to the officer. That threat of physical harm is a little more murky in Judge Cross's hypothetical, but it's certainly evidence in the situation that the court sees before it today, where there was no time to evaluate whether there was that serious physical harm. We just know there was, based on the information that Deputy Richardson had at that time and the circumstances surrounding the situation. Assume there was the opportunity to observe that Thompson was not armed. Would you agree under those circumstances that shooting him would be an excessive use of force? I can't agree, Your Honor, because I think that the other facts in this case, it's such a factually specific evaluation, I can't agree that that would be sufficient to make it unreasonable. And the reason I say that, Your Honor, is because I think it's important in this time that there was a reasonable belief that he might be armed, with the fact that we knew he was going to escape, we knew that he was evading arrest for a long period of time. So in your hypothetical, my follow-up would be, are the other factors all consistent with what we know? My hypothetical is that there's sufficient distance to observe that he's not armed. Is it really the government's position that a 15-year-old running out of the house observed to be unarmed, with more than one officer present, poses the type of serious risk of harm that he could be shot as he came out of the door? Your Honor, having understood the hypothetical as that, I think if there's knowledge that the suspect is unarmed, that that changes everything, and it's not the government's position that it would definitely still be reasonable. So the government's position is that the serious threat of harm here is the combination of the might-be-armed and the unfortunate placement and timing that didn't leave the officer the opportunity to make an observation one way or the other with Thompson immediately before him. Correct, Your Honor. And perhaps it's because of how factually specific we have to get in this evaluation that courts have counseled time and again that this can't be a consideration made with the benefit of 20-20 hindsight. You have to look at what happened at the time under those particular circumstances. Was it reasonable in the moment that the gun was discharged? Your Honor, I want to circle back to how we began our discussion today. I made a promise to you I'd like to keep with regard to your question as to Deputy Richardson's motion for summary judgment. I have reviewed Deputy Richardson's motion and his accompanying memo. It appears to be a little bit confusing. He does ask for qualified immunity and specifically says on qualified immunity he's asking for, quote, dismissal of his action. However, at the conclusion of his memo on that section he does identify only count one. So it's unclear whether he's trying to apply a qualified immunity to just count one or to the entire action itself, all the counts. However, we do know that the district court and our theory has been all along that it applies to all. That's how we've proceeded at trial or before the district court. The district court, it appears, did treat his claims of qualified immunity as to all counts. On page 23 of the district court's memorandum of decision it identifies the qualified immunity count as providing relief for Deputy Richardson potentially on various counts. So it appears that it was understood by the district court to be applying to all the counts for civil damages pending against Deputy Richardson. With regard to the second part of the question you asked, we are, and I believe, Your Honor, please correct me if I'm wrong. As I recall, it was whether we're relying on Nibs versus, Nibs versus Roberts for that proposition. Yes, that's one of the cases that we would rely on. The court said in Nibs under the common law in the Supreme Court section 1983 actions does government officials suit in their individual capacities are entitled to the defense of qualified immunity. But it's citing to other cases that refer to situations where an officer is sued for Fourth Amendment violations or other tortious conduct. And so we have in this case allegations of both a violation of the Fourth Amendment as well as other tortious conduct. There's reference in Nibs to the defense of qualified immunity available against, available to employees individually under section 1983 and the common law. But the discussion there is earlier and then we addressed this as well in Davis versus New Hampshire Memorial Hospital. It's not entirely clear. Maybe you can help clarify. Is that because of a common law immunity as to discretionary duties of an officer? Or is that truly a qualified immunity defense analogous to federal qualified immunity as applied to the common law claims? It is unclear, Your Honor. I think that it, I think it has to be the latter. It has to be more akin to the federal law qualified immunity defense. Federal law has recognized that it can be used against regular common law claims. And we know from Nibs that the Virgin Islands has sort of adopted that. So I guess, like I said, confusing a little bit because local common law has, through Nibs, has sort of adopted that. I'm not sure that's helpful at all. But it seems to be both. In either case, it would be our position that it does, it would protect Deputy Richardson on all of the claims against him. Whichever one is called, that is, whether it's a common law defense as to discretionary duties, as we described in the hospital case, or qualified immunity and some state analog to that. It's your position that that carries over to the state court claims. Yes, thank you. Yes. I do want to just very briefly address two points made by sister counsel. The first, I do want to... Your time is up. Oh, I apologize, and I'll conclude. I'll ask you to do so very quickly, unless my colleagues have other questions at this point. Of course. Let me just ask a question on this. I'm going to call it the Nibs question. Okay. Let me make sure I understand where you think this appeal is. Okay. I've understood this appeal to be an appeal from the denial by the district court of qualified immunity under the 1983 claim. You haven't appealed to this court any determination by the district court on the negligence claims, have you? Well, Your Honor, we appealed the judgment of the district court, and our understanding of that decision was that the district court found a dispute of material facts that would preclude the application of qualified immunity to any of the claims against Deputy Richardson. There is no judgment of the district court at this point. This is an interlocutory appeal. Right, it's an interlocutory appeal. Yes, I'm referring to the decision of the district court on summary judgment. So... All right. Okay. I understand your answer, and I better understand my own question. Thank you. I apologize. Thank you, Your Honor. With that, we ask for reversal of... Unless Your Honor has any further questions, we'd ask for reversal of the district court decision on summary judgment. Can you identify along the lines of Judge Fischer's question, identify for us in your brief where you raise qualified immunity as to the common law claims or any common law defense concerning discretionary duties, which we've also recognized as a potential defense under Bridgen Island's law? Your Honor, before I answer the question, let me make sure I understand it. You're asking where in our brief we identify... I'm sorry. Can you restate the question for me? Sure. We understand that you have appealed, and for the most part, what we've been talking about are claims against Richardson in his official capacity. There are also individual claims, that is, personal claims, that go to their state law claims for Bridgen Island's torts. Where do you appeal a denial of qualified immunity as to those common law claims in an individual capacity as distinct from claims against Richardson in his official capacity or the 1983 constitutional law claim? Your Honor, in our opening brief, we're simply asking the court to grant summary judgment in favor of the defendants. We don't clarify on what count, and I believe that gets to the heart of your question. So we don't clarify the distinction in our brief. Thank you. Judge Roth, any other questions? No, I have no other questions. We thank both counsel for your stamina through this long argument and for your helpful briefing and argument, and we will take the case under advisement.